## UNITED STATES v. NORTH & SOUTH SHIPPING CO.

(Circuit Court of Appeals, First Circuit. February 19, 1927.)

No. 2092.

Collision ⬙═⊃49—Evidence held to sustain finding that schooner was free from fault and that steamship was at fault at time of collision.

Evidence *held* to sustain finding that schooner equipped with requisite side lights, properly set and screened, was free from fault in collision with steamship, and that steamship under circumstances was at fault for proceeding at full speed, when conditions were such as to require proceeding at moderate speed.

Appeal from the District Court of the United States for the District of Maine; John A. Peters, Judge.

Libel by the North & South Shipping Company against the United States, wherein the United States filed a cross-libel. Decree for libelant, and the United States appeals. Affirmed.

Horace M. Gray, of New York City (Frederick R. Dyer, U. S. Atty., and William B. Nulty, Asst. U. S. Atty., both of Portland, Me., on the brief), for the United States.

Nathan W. Thompson, of Portland, Me. (Woodman, Whitehouse, Skelton & Thompson, of Portland, Me., on the brief), for appellee.

Before BINGHAM, JOHNSON, and ANDERSON, Circuit Judges.

BINGHAM, Circuit Judge. These are cross-libels to recover damages due to a collision between the five-masted schooner Bright, owned by the North & South Shipping Company, a Maine corporation, and the steamship Hampton Roads, owned by the United States, which occurred in the early morning of March 5, 1925, at a point between Winter Quarter Light Ship and Fenwick Island Light Ship. In the District Court the causes were consolidated and heard together.

The Bright is a five-masted schooner, 258 feet long, 48.6 feet beam, 24 feet depth of hold, of the burden of 2,176 tons, hailing from the port of Georgetown, in the district of Maine. March 4, 1925, she left Hampton Roads, Va., bound to Portland, Me., with a full cargo of about 3,710 tons of coal. On the morning of the 5th of March, about 5 a. m., she was sailing close-hauled on the starboard tack, with all sails except the jib-topsail set. She had a deck watch, consisting of a mate, of more than 23 years' experience on large sailing vessels, and three able seamen, all of whom were giving close attention to their duties. She was equipped with the requisite side lights, properly set and screened, as required by law; but whether they were burning brightly, or, if burning brightly, were obscured by a haze or mist, is the chief question in the case. There was a light wind blowing from southeast by east, and the schooner was proceeding at a speed of between 4 or 5 knots an hour over the bottom. Shortly after 5 o'clock that morning the lookout on the forecastle head of the Bright saw and reported the range lights of a steamer, which proved to be the Hampton Roads. These lights bore about a half point on the bow of the Bright. At this time the steamship was judged to be about two miles away. Later the red and green side lights of the steamer were seen by those on watch, and were then judged to be between a half and three-fourths of a mile away. Thereupon the mate in charge of the Bright, to attract the attention of the steamer, displayed a flare-up on the sails of the schooner, which was seen by those in charge of the steamship. Up to that time the steamer had been coming directly towards the schooner; but upon the flare-up being given she apparently changed her course, for one

of her lights was shut out. The schooner maintained her course from the time the steamer's lights were observed to the time of the collision.

The steamship Hampton Roads is an oil tanker, about 431 feet long, 59 feet beam, and 33 feet depth of hold. She was proceeding light from Philadelphia to Tampico, and prior to and at the time of the collision was going at full speed and between 10 and 11 knots an hour. Her deck watch at this time consisted of the mate, who had charge of the watch, a lookout, and a man at the wheel. The sky was overcast and dark, and while high up the atmosphere was clear, there was a mist or haze down low on the water. The testimony of those on board the steamship varies as to when they first observed the red light on the schooner; some placing it about a minute, or when the vessels were in the vicinity of 1,500 feet apart, others placing it at five or six minutes, or when the vessels were from 7,500 to 9,000 feet apart. The log of the steamship placed the distance at 4,500 feet, or about three-fourths of a mile, which is in substantial accord with the distance at which those on board the schooner first observed the side lights on the steamer. There is other evidence showing that those on board of the respective vessels observed the approach of the other at substantially the same time, for the mate on the schooner testified that he displayed a flare light immediately upon observing the side lights on the steamer, and the mate on the steamer testified that he observed the white flare on the schooner immediately after seeing her red light. When the red light on the schooner was observed by those on board the steamer, the helm on the steamer was ported, and then almost immediately put hard aport, and the steamer started to change her heading to starboard. The vessels came abreast of and parallel to one another, but owing to their closeness and the swinging or slewing of the stern of the steamship, due to her helm being put hard to port, her port quarter collided with the port quarter of the schooner, causing damage to the respective vessels, claimed to be considerable to the schooner, but comparatively slight to the steamer.

In the District Court it was found that the night was dark, no moon; that the visibility was rather poor, with a haze or mist hanging over the water; that the schooner's side lights were properly set and burning; that they were burning brightly and complied with the law; that the men on the schooner sighted the range lights on the steamer five minutes or more before the collision, and had plenty of time to, and every reason for, making sure that the lights on the schooner were burning brightly; that according to the evidence on the part of the schooner her lights were examined at 4 o'clock, again by the lookout upon sighting the range lights on the steamer, then again shortly afterwards by the mate, and again by him after the collision, at all which times they were found burning brightly; that the quartermaster on the steamer, who saw the red light on the schooner, testified that it was a bright red light; that the balance of the testimony on the part of the steamer was largely negative; that, while some of the steamer's men said the schooner's red light was dim, they also testified that there was a low haze or mist on the water, and that, if the light had been higher up, it would have been seen earlier. There was also evidence from those on the steamer that just prior to the collision the range lights on a steamer about two miles off were sighted, but her side lights could not be seen. In view of this evidence, the court below accounted for the failure of the steamer to see the schooner's lights sooner to the low haze on the water and the fact that the schooner was low in the water, and not to any defect in the schooner's lights or want of brightness.

We have carefully examined the testimony, and are of the opinion that the District Court did not err in finding that the schooner was free from fault, and that the collision was due solely to the fault of the steamship, but was right in so finding; that the steamship, under the circumstances disclosed, was at fault for not keeping out of the way of the schooner, and for proceeding at full speed, when the conditions were such as to require her to proceed at a moderate speed; and that she was also at fault in other respects, which we need not state.

The decree of the District Court is affirmed, with costs in this court to the appellee.